THE COURT.
 

 This action was brought by the members of a bondholders’ protective committee against eleven guarantors to recover upon a written guaranty of a $350,000 bond issue of The Annandale Corporation, which guaranty reads as follows:
 

 ‘ ‘ GUARANTEE. BE IT REMEMBERED that the undersigned, being stockholders of THE ANNANDALE CORPORATION, a corporation organized and existing under the laws of the State of California, in consideration of the issuance and sale of three hundred fifty thousand dollars ($350,000.00) in par amount of the First Mortgage Six and One-half Per Cent Sinking Fund Gold Bonds of the corporation, secured by a certain trust indenture between THE ANNANDALE CORPORATION, as grantor and trustor, and CITIZENS TRUST AND SAVINGS BANK, as grantee and trustee, dated September .1, 1925, and in consideration of the benefit that will be derived therefrom by each of the undersigned personally and as stockholders of THE ANNANDALE CORPORATION, and to facilitate the sale of said bonds, and to protect the purchasers thereof, do hereby un
 
 *108
 
 conditionally guarantee, as hereinafter provided, to the holders and purchasers, of said bonds from time to time, the punctual payment of The Annandale Corporation First Mortgage Six and One-half Per Cent Sinking Fund Gold Bonds, both principal and interest thereon, at the time and place and in the manner specified in said bonds and in the coupons thereto annexed, and if default in the payment of either principal or interest thereof be made by said The Annandale Corporation, we and each of us, agree punctually to pay said principal and/or interest in the manner specified in said bonds and in the coupons thereto annexed.
 

 “We jointly and severally expressly agree that any indulgence extended to the maker or failure to enforce payment by the sale of any security, or otherwise, shall in no way affect our liability hereunder and we hereby waive notice of nonpayment of any bond or coupon.
 

 “It is provided, however, as a condition hereof that the obligation and liability of each of the undersigned hereunder shall be limited in amount to the fraction of the total amount of principal and interest of said bonds set after his respective name as follows: (Listing the signers of the document, with a fraction after the name of each, starting with ‘W. W. Mines, 1002 Stock Exchange Bldg. 8/60’.) . . . and that each one of the undersigned shall be liable hereunder in an amount equal to, but not in excess of the respective aforesaid fractional amount of the entire principal and interest of said bonds.
 

 “This guarantee is a continuing guarantee and shall not be exhausted by one or more recoveries thereon but shall bind us in the above proportions until payment has been made in full of the principal and interest of said bonds. The holder of any bond may from time to time bring suit upon this guarantee either by himself as plaintiff or as plaintiff in conjunction with the holder of other bonds and in any such suit may join all or any part of us as defendants. This guarantee shall be deposited with and held by the Citizens Trust and Savings Bank and the holder of any bond shall have access thereto for examination.
 

 “WITNESS OTJB HANDS this 11th day of November, 1925. W. W. Mines, Guy M. Rush, A. C. Robbins, by A. C. Robbins, Jr., Atty. in fact, Guy Cochran, M. IT. Pehr, W. P. Story, George A. Orloff, R. W. Allen, M. C. Marsh, Jr., Brian K. Welch, Kenyon F. Lee, N. W. Goodman, Allen T. Archer,
 
 *109
 
 E. R Kibler, Horace N. Taylor, F. W. Braun, A. C. Bobbins. ’ ’
 

 The $350,000 bond issue was created for the financing of a project to purchase, subdivide, improve, and resell a tract of land of some 158 acres located back of the Annandale Golf Club in Pasadena. The bonds, dated September 1, 1925, were secured by deed of trust of the same date on the real property as well as by the guaranty of November 11th. Upon completion of the various negotiations and proceedings necessary to insure the validity of the bonds, they were on January 2, 1926, finally released from escrow for sale under the terms of the trust and of permits issued by the corporation commissioner. Between January 2, 1926, and October 11, 1926, the entire issue was purchased, in instalments at a price of 93 plus accrued interest, by the John M. C. Marble Company and Hunter, Dulin & Company. These firms then marketed the bonds to their clients. On March 1, 1932, at which time bonds of an aggregate face value of $104,000 had been retired, leaving $246,000 outstanding, The Annandale Corporation defaulted in interest payments and thereafter it made no payments on the bonds of either principal or interest. It likewise failed to pay taxes on the real property which, although theretofore valued at some $790,000, had greatly depreciated in value. No payments were made upon the guaranty. In May, 1932, the trustee, in response to notice of default and demand, accelerated the outstanding bonds, making them immediately due and payable. Meanwhile the bondholders had organized a protective committee to further their interests and a number of them had deposited their outstanding bonds in trust under the terms of the bondholders’ protective agreement, which was in the usual form of an agreement of that character.
 

 On September 29, 1932, this action was filed by the members of the bondholders’ protective committee to recover upon the guaranty as to deposited outstanding bonds in the aggregate principal sum of $216,000.
 

 After prolonged hearings, demurrers, filed separately by the various defendants, were sustained to the complaint and to the first and second amended complaints but were overruled as to the third amended complaint. Thereafter plaintiffs dismissed the action as against M. H. Pehr and George A. Orloff, two of the eleven original defendants. The cause
 
 *110
 
 was finally tried upon the issues joined by plaintiffs’ third amended complaint as amended, and the separate answers of the other nine defendants thereto; the amendment and second amendment to the third amended complaint and the answers of all said defendants thereto; the cross-complaint of defendant Goodman, and the answers of plaintiffs, the joint answer of seven defendants and cross-defendant Archer, and the separate answer of defendant and cross-defendant Taylor thereto; and the supplement to the cross-complaint as amended and the joint answer of all said defendants and cross-defendants thereto. The conclusion of the trial court was that plaintiffs were entitled to recover against each of the nine defendants in respective specified amounts aggregating $126,108.42, but that defendant Goodman should take nothing by his cross-action. A judgment was entered accordingly. From this judgment the nine defendants united in filing notice of .appeal and eight of them have joined in a single set of briefs on appeal. Defendant and cross-complainant Goodman, whose status differs from that of his co-defendants, has filed a separate set of briefs. Plaintiffs, who were dissatisfied with the amount of their award, moved the court for an order vacating the judgment and for the entry of another and different judgment. This motion was denied and plaintiffs have appealed from the order of denial. This appeal is also separately briefed. The appeals will now be considered in the following order: (1) Joint appeal of defendants from the judgment; (2) The separate appeal of plaintiffs from the order denying their motion for an order vacating judgment and for entry of another and different judgment; and (3) The appeal of defendant and cross-complainant Goodman.
 

 Joint Appeal of Defendants From, the Judgment:
 

 The first main point of these appellants is stated as follows: “Does a Guaranty made for the express benefit of a special class of persons (holders and purchasers) impose any liability upon the guarantors in favor of persons who are not within the class, or assignees of the class for whose benefit the guaranty was made ? ’ ’ Appellants urge that as the bondholders ’ protective agreement did not by. its terms constitute plaintiffs “holders and purchasers” of the bonds, and as no evidence was offered or received that the depositors who turned in their bonds under that agreement were in fact
 
 *111
 
 “holders and purchasers”, plaintiffs had no standing in court and their complaint failed to state a cause of action.
 

 In disposing of this contention reference must be made to the terms of the bondholders’ agreement, particularly those bearing upon plaintiffs’ capacity to sue, and the allegations of plaintiffs’ complaint. The agreement is dated March 31, 1932. Preliminary recitals refer to issuance of the bonds, to the trust indenture securing them, to the guaranty, to the default of the corporation, and to the fact that “it is in the best interest of the depositors to act jointly and through a competent committee to protect their interests and enforce their rights in accordance with the terms of said trust indenture . . . and under said guaranty”. Section 1' provides that any holder of bonds may become a party to the agreement either by signing it or by depositing his bond or bonds within a specified time with the depositary, Citizens National Trust & Savings Bank of Los Angeles, trust department, and that upon such deposit, a deposit certificate, in specified form, shall be issued to the depositor. The section provides for the transfer of certificates of deposit, and further provides: “After any such deposit no separate action shall be taken by a depositor with respect to the deposited securities. ’ ’
 

 Section 2 of the agreement provides: “2. To the end that the Committee may be able to protect and promote the interest of the Depositors, the Committee is hereby vested under the terms of this agreement
 
 as trustee of an express trust with legal title to and ownership
 
 of all the Deposited Securities deposited hereunder, and the Depositors hereby, for the consideration aforesaid, and each also in consideration of the assignment and transfer by the other Depositors, severally assign, transfer and set over to the Committee the bonds and coupons of the Depositors respectively deposited by them hereunder, and no limitation is imposed on the powers of the Committee as the legal owner except the duty of doing whatever is calculated in its opinion to promote the interest of the Depositors without preference priority of any of them over any other of them, and the Committee hereby assumes such duty. The Depositors hereby constitute and appoint the Committee their attorneys in fact . . . and . . . empower the Committee to institute . . . such legal proceedings . . . necessary or convenient to enforce any remedies provided for in the deed of trust in the event of a default . . . and to enforce said agreement of guaranty, and to perform any act,
 
 *112
 
 proceeding or thing which the Depositors themselves, or any of them, might or could do if this agreement had not been made, including the commencement and prosecution to final judgment and satisfaction or the settlement and compromise of any action to enforce the rights of Depositors under said trust indenture or said agreement of guaranty or under the laws of the state of California with respect to stockholders’ liability.’’
 

 Section- 3 elaborates in still greater detail the authority given to the committee and the various incidents of ownership of the bonds vested in them. The remaining thirteen sections of the agreement contained detailed provisions for effecting its purposes and terminating and completing the trust.
 

 Undoubtedly this agreement was intended to and did vest in the members of the committee the legal title to and ownership of the deposited bonds.
 
 (Bullard
 
 v.
 
 City of Cisco,
 
 290 U. S. 179 [54 Sup. Ct. 177, 78 L. Ed. 254, 93 A. L. R. 141];
 
 Dreiske
 
 v.
 
 Los Angeles I. S. Corp.,
 
 13 Cal. App. (2d) 59 [56 Pac. (2d) 299].)
 

 We shall now refer to the allegations of plaintiffs’ complaint, particularly those relating to their right to sue upon the guaranty. The members of the bondholders’ committee were three, Mr. Spencer Thorpe, president of the Hamilton Life Insurance Company, which company owned $10,000 worth of the bonds; Mr. Ernest E. Jones, treasurer of Pomona College, which owned $30,000 of the bonds, and Mr. John M. Marble of the John M. C. Marble Company which had marketed to its clients half of the bond issue. These three persons originally brought this action in their own names as follows: "Spencer Thorpe, Ernest E. Jones and John M. Marble, Plaintiffs’’, and in their several complaints, including the third amended complaint, they alleged: "That the plaintiffs herein are now and since prior to the filing of this action on the 29th day of September, 1932, have been, the owners and holders as joint tenants with right of survivor-ship of certain of said bonds of The Annandale Corporation, in an aggregate principal sum of Two hundred Sixteen Thousand Dollars (listing the bonds). ...” During the trial of this action, however, at the time the bondholders' agreement was offered in evidence, the trial court ruled that plaintiffs were not suing in their individual capacity, but were simply trustees of an express trust, or assignees of the
 
 *113
 
 bonds for purposes of collection, and permitted them to amend their third amended complaint to allege: ‘ ‘ That the plaintiffs herein are now and since prior to the filing of this action on the 29th day of September, 1932, have been, the holders of legal title to and ownership of, and are the owners, holders and purchasers of, an aggregate of $216,000 principal amount of The Annandale Corporation First Mortgage Six and One-half Per Cent Sinking Fund Gold Bonds, as Agents and Trustees for depositing bondholders under the provisions of such Bondholders’ Protective Agreement, which said Bondholders’ Protective Agreement is in words and figures as follows (setting it forth
 
 in haec verba).
 
 ...” At the same time in the caption of the complaint the names of plaintiffs as individuals were eliminated and it was made to read: ‘ Spencer Thorpe, Ernest E. Jones and John M. Marble as the Bondholders’ Protective Committee and as .agents and trustees under the provisions of the Annandale Corporation Bondholders’ Protective Agreement dated as of March 31, 1932, Plaintiffs. ...”
 

 The body of the pleading alleged the facts relative to creation of the bond issue, execution of the trust indenture, and the further proceedings which culminated in completion of the escrow on January 2, 1926, and sale of the bonds. It alleged that prior to sale and delivery of any of the bonds, and under date of November 11, 1925, in response to and in compliance with the request and demand of Hunter, Dulin & Company and John M. C. Marble Company, the underwriters and initial purchasers of all the bonds, and in accordance with the terms of the agreement between those companies and The Annandale Corporation, and in consideration of the sale and underwriting, defendants executed and delivered and deposited with the escrow agent contemporaneously with the delivery of the bonds, “for the benefit of each and all of the owners, holders and purchasers of said bonds from time to time”, the written guaranty, setting it forth in full. Next was alleged the default of the corporation and the acceleration of the due date of the bonds and that “the plaintiffs herein, as such bondholders, did previously, to-wit, by the filing of this action on the 29th day of September, 1932, and do now affirm, ratify and accept said guarantee so made for their benefit, and that said defendants by their execution and delivery of said guarantee . . . did thereby make and enter into a contract expressly for the
 
 *114
 
 benefit of third persons, to-wit, the plaintiffs herein, among others”. The prayer of the complaint was for judgment in the sum of $244,080, plus interest on the principal sum of $216,000 from September 1, 1933, to date of trial, the liability of defendants, however, to be limited to the fraction of the total and entire amount of principal and interest guaranteed by each, listing the defendants, the alleged fractional liability of each and the sum sought to be recovered from each.
 

 The position of plaintiffs is that their third amended complaint, both as originally drawn and as amended during trial, was sufficient to state a cause of action and that the amendment, although not at all improper, was unnecessary. By the pleading as it stood when the cause went to trial, plaintiffs, as individuals, alleged themselves to be “owners and holders as joint tenants with right of survivorship” of the bonds. There is authority which supports the argument that this was a sufficient allegation of plaintiffs’ capacity to sue upon the guaranty, and brought them within the class of persons for whose benefit it was made.
 
 (Cortelyou
 
 v.
 
 Jones,
 
 132 Cal. 131 [64 Pac. 119]; 25 Cal. Jur., p. 352, sec. 197; 20 Cal. Jur., p. 495, see. 12.) However, we here expressly refrain from passing upon the. adequacy of that allegation for the reason that the latter amendment of the complaint, alleging the full details of the trust relationship, was properly allowed by the court, and the pleading, as so amended, was amply sufficient to state a cause of action. Plaintiffs, as has already been stated, acquired, by virtue of the bondholders’ protective agreement, legal title to and ownership of the deposited bonds as trustees of an express trust. That trustees of an express trust may bring suit in their own names, without joining the beneficiaries, is thoroughly settled. (Secs. 367, 369, Code Civ. Proc.; 20 Cal. Jur., p. 493, sec. 12; 25 Cal. Jur., p. 351, sec. 197.) The trial court’s action in requiring or permitting the amendment and the change in the caption of the pleading was proper and it did not constitute a change in the cause of action or in the theory upon which the suit was predicated. (Secs. 469, 473, Code Civ. Proc.;
 
 Lasar
 
 v.
 
 Johnson,
 
 125 Cal. 549 [58 Pac. 161];
 
 Security Trust
 
 &
 
 Sav. Bank
 
 v.
 
 Southern Pac. R. Co.,
 
 214 Cal. 81 [3 Pac. (2d) 1015];
 
 Fairbairn
 
 v.
 
 Eaton,
 
 6 Cal. App. (2d) 264 [43 Pac. (2d) 1113]; 49 C. J., p. 518.)
 

 
 *115
 
 These appellants contend that even if it be held that plaintiffs’ allegations in their third amended complaint as amended, to the effect that they were “owners, holders and purchasers”, etc., of the bonds, entitled them to go to trial, nevertheless, upon the trial they utterly failed to show that they were within the special class of persons for whose benefit the guaranty was made, i. e., “holders and purchasers”; that aside from the recitals in the bondholders’ agreement, plaintiffs did not offer, and there was not received in evidence, any proof which would tend to show that plaintiffs, or the depositors of the bonds whom they represent, ever owned or purchased any of the bonds, except that it appears that Hamilton Life Insurance Company purchased and now owns $10,000 face value of said bonds; that plaintiffs made no attempt to prove that the persons who deposited the bonds or the holders of certificates of deposit had any interest in the bonds or were entitled to the benefits of the guaranty.
 

 Upon the trial plaintiffs did not attempt to show under what circumstances each depositor had acquired and held the bonds deposited under the bondholders’ agreement but plaintiffs did introduce in evidence full records of the depositary bank giving complete data as to the deposit of the bonds, the issuance of certificates of deposit, and subsequent transactions as to said certificates. In other words, plaintiffs showed that as trustees of the express trust they had acquired and held legal title to and ownership of certain described bonds of $216,000 face value, and the trial court so found. More particularly, the trial court found that the allegations of paragraph III of the amendment to the third amended complaint (“that the plaintiffs herein are now and since prior to the filing of this action . . . have been, the holders of legal title to and ownership of, and are the owners, holders and purchasers of, an aggregate of $216,000 principal amount of” the bonds “ ... as Agents and trustees for depositing bondholders under’-’ the pleaded bondholders’ protective agreement) were true,
 
 “except”
 
 that the court found that “no money was paid by plaintiffs herein or any of them to the depositing bondholders or any thereof, either at the time of their respective deposits of bonds or at any other time, and that
 
 said plaintiffs were and are not purchasers in the sense that they paid money for said bonds”.
 

 These appellants contend that these findings do not establish plaintiffs within the class of persons entitled to re
 
 *116
 
 cover upon the guaranty, to wit: as “holders and purchasers” of the bonds; that while plaintiffs may be “holders” of the bonds, neither the evidence nor the findings establish their status as “purchasers” thereof within the usual and ordinary meaning of the latter term, as is apparent from the language of the underlined portion of the finding last above quoted. To state appellants’ claim another way: They urge that the guaranty runs to the benefit only of “holders and purchasers”, not “holders” or “purchasers”, and that plaintiffs, to bring themselves within the special class entitled to recover upon that instrument, must show that they were both “holders” and “purchasers”, within the common meaning of the latter term as signifying those who have acquired property by buying it for a price in money. Concededly, as the court found, plaintiffs are not “purchasers in the sense that they paid money for said bonds”. However, we find it unnecessary to indulge in a discussion of the refinements of the definition of the term “purchasers”, as it is our view that the guaranty runs for the benefit of both “holders” and “purchasers” of the bonds. This is apparent from the exact language of the guaranty that the signers “do hereby unconditionally guarantee ... to the holders and purchasers” payment of the bonds; that ‘ the
 
 holder
 
 of any bond may from time to time bring suit upon this guarantee either by himself as plaintiff or as plaintiff in conjunction with the holder of other bonds”, etc. To interpret the instrument to limit recovery to those who paid actual money for their bonds, to the exclusion of those who may have acquired them by gift, devise, or in another way as did these plaintiffs, would be to .defeat the obvious purpose of the guaranty and to leave without relief various classes of persons obviously entitled thereto. On the other hand, to hold that the guaranty runs for the benefit of “holders” as well as of “purchasers” is not to extend its terms by implication or inference, but is merely to give to the language used a reasonable and normal construction. It follows that the trial court’s finding to the effect that plaintiffs were, in some sense of the word, “purchasers” of the bonds is not inconsistent with their true position, and the finding that plaintiffs are “holders” of the bonds is fully supported by the evidence showing the various deposits under the bondholders’ agreement.
 

 The trial court found to be true plaintiffs’ allegation that as bondholders they did, by the filing of this action, and
 
 *117
 
 “do now affirm, ratify and accept said guarantee so made for their benefit, and that said defendants by . . . said guarantee . . . did thereby make and enter into a contract expressly for the benefit of third persons, to wit, the plaintiffs herein, among others”. The court also found that “it is not true that plaintiffs have no right, title or interest in said guarantee; on the contrary it is true and is so found that they are the beneficiaries thereof to the extent of the outstanding bonds which they hold, and are entitled to such benefits of said Guarantee and the right to sue thereon in accordance with its express provisions and the provisions of the bondholders’ protective agreement . . . irrespective of the fact that there were no mesne transfers or assignments in writing of said guarantee . . . that said guarantee was made for the benefit of all owners, holders and purchasers of bonds . . . and was not made for the exclusive benefit of the bonds of said corporation owned and held by plaintiffs, and that it is incumbent upon the court to preserve the rights of all bondholders in common under a guarantee of the character sued upon herein . . . that said guarantee was delivered on January 2, 1926, at the same time as and concurrently with the original obligation of said The Annandale Corporation, to wit, the first installment of Two Hundred Fifty Thousand Dollars aggregate principal amount of said bonds, the remaining installments of which were delivered during the year 1926, as hereinabove found; that the parties beneficiary under said guarantee, while not identified therein by name, and while not parties to the original transactions culminating in the issuance of said bonds, and were third parties so far as said transactions were concerned, the said beneficiaries of said guarantee are nevertheless clearly identified by the express language of said guarantee”.
 

 These appellants claim that the finding of acceptance by plaintiffs of a guaranty for their benefit was erroneous; that plaintiffs could not qualify as beneficiaries of the guaranty as a contract allegedly made for the benefit of third persons, without alleging and proving that the persons whom they represented were holders and purchasers of the bonds; and furthermore that it appears from the facts that the acceptance of the offer made by the guarantors, if the same be construed as an offer .for the benefit of plaintiffs, was revoked by the lapse of an unreasonable time without communication of the acceptance. (See. 1587, Civ. Code.) This conten
 
 *118
 
 tion is without merit. The guaranty, by its terms, is not an offer of guaranty, but an absolute or unconditional guaranty (secs. 2787, 2806, Civ. Code) to the “holders and purchasers of said bonds from time to time”, a “continuing guarantee”, which “shall not be exhausted by one or more recoveries thereon but shall bind us in the above proportions until payment has been made in full of the principal and interest of said bonds”. An absolute guaranty is binding upon the guarantor without notice of acceptance, and delay in enforcement does not exonerate him. (Secs. 2795 and 2823, Civ. Code.) Thus the fact that more than six years elapsed between the date of execution of the guaranty and the date of filing of this action is immaterial. Furthermore, even were the guaranty to be treated as in the nature of a contract for the benefit of third persons, it would appear that there was no unreasonable lapse of time in the bringing of this action, which was filed promptly after the default of the corporation and prior to any effort of the guarantors to rescind. (Secs. 1559 and 1587, Civ. Code.)
 

 A further question grows out of the fact that the guaranty, a separate instrument, was not printed on the bonds, and, so far as the record shows, the bondholders may not have acquired or purchased the bonds with knowledge of or in reliance upon the guaranty. Plaintiffs introduced no evidence to show under what conditions or upon what representations the bonds were acquired or purchased and it may be that they were acquired or purchased in ignorance of the existence of the guaranty. Hence the question is presented : Did assignment of the debt (bond) operate as an assignment of the guaranty, so that whoever may enforce the debt may enforce the guaranty, and this even though the assignee may have been ignorant of the guaranty at the time he acquired the debt? On this subject there is a long standing conflict of authority (7 Cyc. 542), which has never been resolved by the courts of this state. We here approve the rule which is stated as follows in Spencer on Suretyship, pages 152, 153, section 113:
 

 “By weight of authority also, a guaranty is assignable even before a cause of action thereon has become complete, if the contract guaranteed is itself assignable as not being personal in its character, and can be enforced by the same person who can enforce the principal obligation, unless it
 
 *119
 
 manifests a plain intent to restrict the guarantors’ liability to the original creditor. Furthermore, whatever operates as an assignment of the debt will operate,
 
 prima facie
 
 at least, as an assignment of the guaranty, on the theory that it is, like a mortgage, an incident thereof, so that whoever may enforce the debt may enforce the guarantee; and this was held even though the assignee may have been ignorant of the guaranty when he acquired the debt. ’ ’
 

 The text writer cites as authority for the last statement
 
 Tidioute Sav. Bank
 
 v.
 
 Libbey,
 
 101 Wis. 193 [77 N. W. 182, 70 Am. St. Rep. 907], That case is directly in point here. The defendants in said action executed and delivered to the R. Company a written guaranty of all indebtedness then due or to become due to the R. Company, or its assigns, occasioned by any act of the F. Company, in which company defendants were heavy stockholders. Thereafter the F. Company sold and endorsed a promissory note of C. Company to the R. Company. The R. Company then sold' the note to plaintiff bank, which took it without notice of the existence of defendants’ written guaranty. No formal assignment of the guaranty was made. The note was presented for payment, which was refused. Learning of the guaranty, plaintiff bank then sued defendant guarantors and had recovery on the theory that the transfer of the note carried with it all security without any formal assignment or delivery, or even mention of the latter. Among other things, the court said: “The fact that the Tidioute Savings Bank did not know of the existence of this guaranty at the time it purchased the C. . . . Company note is of no significance. The securities pledged for a debt follow it, in equity, no matter how the debt be modified or into whose hands it may come. Until the debt is paid, the pledge accompanies it, and remains for its payment, and is available to all who may acquire title thereto. Colebrooke, Collateral Securities, section 79;
 
 Stearns
 
 v.
 
 Bates,
 
 46 Conn. 306. The guaranty in question was given to secure the payment of any and all indebtedness due, or thereafter to become due, to R. . . . Co., or their
 
 assigns
 
 , growing out of or occasioned by any or through any act or acts of the said F. . . . Company’. The defendant used apt words to make the guaranty impersonal, so far as the holders of the debts so created are concerned. They executed and delivered a contract as security for all the debts created by the F. . . . Company to R. . . . Co. within the amount limited, which became an incident to each
 
 *120
 
 such debt, and which passed to the bank
 
 pro rata,
 
 upon its purchase of the note, even though it may not have known of its existence at that time.
 
 (Keyes
 
 v.
 
 Wood,
 
 21 Vt. 331;
 
 Evertson
 
 v.
 
 Booth,
 
 19 Johns. (N. Y.) 486.) To require the defendants to pay these notes is but to require them to fulfill their promise. It entails no hardship and creates no obligation beyond the plain tenor of their contract.”
 

 In
 
 Postlethwaite
 
 v.
 
 Minor,
 
 168 Cal. 227, at page 232 [142 Pac. 55], will be found certain language which is not in harmony with the above holding. These remarks, however, are dicta for that decision turned upon the basic question of the existence or nonexistence of the guaranty and the court concluded that there was no present contract of guaranty. Said language we expressly disapprove.
 

 The second main point of these appellants is stated as follows: ‘ ‘ The Guaranty protects one class only—the purchasers of the bonds. The evidence conclusively shows that Hunter, Dulin & Co. and the John M. C. Marble Company were the purchasers of all the bonds from The Annandale Corporation and purchased the same in installments from time to time. As plaintiffs show no privity with them, they are not entitled to judgment.” Appellants urge that from the face of the guaranty and other evidence it appears that the guaranty was made for the benefit of Hunter, Dulin & Co., and the John M. C. Marble Company, the original purchasers of the bonds, and that when they purchased, the guaranty became a binding obligation in their favor; that since they did not execute any assignment thereof to any person or persons, the trial court erred when it construed the guaranty as having been made for the benefit of plaintiffs who, the evidence failed to show, were purchasers of any of said bonds or in privity with either the Hunter, Dulin & Co., or the John M. C. Marble Company.
 

 These appellants refer to the recital in the guaranty that it was given “in consideration of the issuance and sale” of bonds of $350,000 par value, etc., “and to facilitate the sale of said bonds, and to protect the purchasers thereof”; also to the evidence showing that the entire issue was purchased, half and half by the John M. C. Marble Company and the Hunter, Dulin & Company, in instalments as follows : January 2,1926—a block of bonds of $250,000 par value, purchased half by each company; March 15, 1926, $15,000 purchased by Hunter, Dulin & Company, $10,000 by John
 
 *121
 
 M. C. Marble Company; May 12, 1926, $35,000 by Hunter, Dulin & Company, $15,000 by John M. C. Marble Company; October 1, 1926—$15,000 by John M. C. Marble Company; and October 11, 1926, a final instalment of $10,000 by the latter company, thus completing the purchase of the entire issue by said two companies. The purchase price was received, through administration of the trust, for the benefit of The Annandale Corporation.
 

 Upon trial of the cause several of the defendant guarantors testified, over objection of plaintiffs, that in signing the guaranty they intended to protect and believed they were protecting only the initial purchasers of the bonds, that is, said two companies or anyone who bought bonds from the corporation. These witnesses testified that they construed the words “purchasers, of said bonds from time to time”, found in the sentence of the guaranty reading: “ ... do hereby unconditionally guarantee ... to the holders and purchasers, of said bonds from time to time, the punctual payment ... ”, of the bonds, as referring to the purchase “from time to time”, during 1926 in instalments, of the bonds by the John M. C. Marble Company and the Hunter, Dulin Company.
 

 This parol evidence of the guarantors’ secret intention in executing the guaranty, would seem to have been inadmissible, in the light of the precise phraseology of the guaranty itself and of the other competent evidence. The guaranty was not drawn hastily but was considered over a period of months preceding the culmination of the transaction on January 2, 1926. Its meaning is clear. Had it been the intention to protect only the initial purchasers of the bonds, undoubtedly the guaranty would have been drafted to run to the benefit of “initial purchasers”, or of the John M. C. Marble Company and Hunter, Dulin & Company, instead of to the benefit of “holders and purchasers, of said bonds from time to time”. Then, too, the statement that the guaranty was to protect only initial purchasers is inconsistent with its further provisions that ‘ This guarantee is a continuing guarantee and shall not be exhausted by one or more recoveries thereon but shall bind us in the above proportions until payment has been made in full of the principal and interest of said bonds. The holder of any bond may from time to time bring suit upon this guarantee either by himself as plaintiff or as plaintiff in conjunction with the holder of other bonds.
 
 *122
 
 . . . This guarantee shall be deposited with and held by the Citizens Trust and Savings Bank and the holder of any bond shall have access thereto for examination.”
 

 Whether or not the John M. C. Marble Company and Hunter, Dulin & Company were “underwriters”, in the sense of that term given by appellants, of the bond issue (as held by the court below in finding true various allegations of the third amended complaint), is immaterial, for the fact of the matter was that both companies purchased the bonds for the purpose of marketing them to their clients and did so market them, and knowledge of this purpose and of the desire to protect purchasers by guaranty was freely circulated among the guarantors. Some of the evidence on this subject is as follows :
 

 At the very inception of the negotiations for purchase of the bonds by the John M. C. Marble Company, that company demanded a guaranty. (The Hunter, Dulin & Company entered upon the scene at a later date.) As early as May 29, 1925, the John M. C. Marble Company addressed a letter to the Annandale Syndicate reading in part: “We understand that you are contemplating the subdivision and sale of approximately 158 acres of land adjacent to the Annandale Country Club. ... we also understand that it is your intention to finance this subdivision with a bond issue totaling $350,000, ... We will purchase these bonds from you at 93 and accrued interest, subject to the following terms and conditions. $135,000 of the bonds are to be issued at once. This amount is to be used to complete the purchase of the property. The next installment of bonds to be taken down will consist of $115,000 par value. These are to be taken down in blocks of not less than $20,000 on engineers certificates with the understanding that the last $25,000 may be taken down without certificates. This amount of $25,000 is to be used in the partial liquidation of a note of the syndicate now outstanding. The last $100,000 of bonds may be issued in blocks of not less than $20,000 on the following basis. You must show the expenditure of an equal amount of money in addition to the bond money desired, or you may deposit with the trustee mortgages, contracts of sale, or trust deeds, in addition to those already outstanding in double this amount. The same to be approved by ourselves before the bonds are issued. The bonds are to be secured by first mort
 
 *123
 
 gage upon the property and by assignment, of any contracts, mortgages, or bills receivable that may be created in the selling of the property and you are to furnish us with satisfactory guaranty of title evidencing the first lien of the mortgage. . . .
 
 The bonds are to be further secured by the unconditional guarantee, principal and interest by the various members of the syndicate.
 
 This guarantee to be on a rateable and several basis, based on each member's proportionate interest in the syndicate. . . . Your acceptance of the above is to constitute a valid and binding contract between the John M. C. Marble Company and yourselves. Very truly yours, the John M. C. Marble Company by H. M. Worcester, Vice. Pres.” This letter was endorsed: “Accepted and agreed to: W. W. Mines, W. P. Story, F. W. Braun, Kenyon F. Lee, Horace N. Taylor, M. H. Pehr, Brian K. Welch, Edwin B. Kibler, N. W. Goodman, Guy Cochran, A. C. Bobbins, John B. Powers.” All of these parties except Powers later signed the guarantee and seven of them were named as defendants when this action was filed.
 

 About October 1, 1925, Hunter, Dulin & Company, which by that date had become interested with the John M. C. Marble Company in the partial purchase of the bond issue, prepared certain advertising copy designed to foster purchase of the bonds by the general public. Under the heading “GUABANTEE”, this advertisement stated: “As additional security these bonds, will be unconditionally guaranteed, both principal and interest, ratably and severally by the following group of men who are the owners of all the outstanding stock of the company” (listing all but four of the seventeen guarantors and one Powers). On this advertising copy appeared the notations: “OK Gibson, Dunn & Crutcher by J. C. Macfarland, Oct 1 1925 (Mr. Macfarland of the law firm of Gibson, Dunn & Crutcher prepared the bond forms and many of the other documents used in connection with the bond issue); OK Guy M. Bush, W. W. Mines, OK WPS (W. P. Story); OK N. W. Goodman by M A Lyon, Atty., OK Kenyon F. Lee.” In admitting the advertising copy in evidence the trial court ruled that only the defendants who had put their OK’s thereon would be bound by it and all of the endorsements were not identified.
 

 Bepresentatives of both the John M. C. Marble Company and Hunter, Dulin & Company testified that the bonds were
 
 *124
 
 purchased for resale and they were sold to the respective clients of those two firms; that they could not and would not have been marketed without protection of the guaranty. In a letter dated December 31, 1925, written by-the John M. C. Marble Company and Hunter, Dulin & Company to the escrow agent transmitting their check to be used in payment of the purchase price of the first $250,000 instalment of bonds, it was specified that the check was to be delivered only upon compliance with certain instructions, requiring among other things that the escrow agent receive: (1) Permit of the corporation commissioner authorizing issuance and sale of the bonds; (2) Opinion of Gibson, Dunn & Crutcher approving the regularity of the proceedings for creation of the indebtedness; (3) Written instrument of guaranty of the bonds signed by the guarantors (listing them); and (4) Policy of title insurance showing the recording of the mortgage or deed ' of trust as a first lien on the real property securing the bonds.
 

 Under the showing made by the record it is clear that appellants’ contention that the guaranty was intended to run solely to the benefit of the John M. C. Marble Company and Hunter, Dulin & Company, or other initial purchasers from the corporation, cannot be sustained. In view of the absolute nature of the guaranty running to a designated class, and not to initial purchasers, no formal written assignment of the guaranty to plaintiffs was necessary. Plaintiff’s title to the bonds brings them within the class for whose benefit the guaranty was made and they are entitled to recover upon it without assignment thereof.
 

 The third main contention of these appellants grows out of the fact that between the date shown on the guaranty, November 11, 1925, and January 2, 1926, the date of completion of the steps incident to valid issuance of the bonds, certain changes were made in the provisions of the trust indenture securing the bonds. Appellants state their contention as follows: “Plaintiffs failed to prove that preliminary negotiations for the guaranty of bonds of Annandale, as a part of which preliminary negotiations an indenture of trust containing the terms and conditions upon which the bonds were to be secured and paid by Annandale and guaranteed by the guarantors was to be executed, were ever finally consummated with the consent of all parties interested, and no liability under said alleged guarantee was established. There was no meeting of the minds upon the alleged guarantee or the
 
 *125
 
 terms of the indenture of trust which is referred to in the guarantee and in the bonds, which indenture of trust forms a part of the contract of guarantee.” Appellants’ position is that the guaranty consists of three documents, i. e., guaranty, bonds, and trust indenture, all of which must be construed together to ascertain whether there is any basis upon which to hold the guarantors liable; that as the evidence shows that subsequent to execution of the guaranty and without the knowledge or consent of the guarantors, material changes were made in the proposed form of trust indenture, there never actually came into existence any valid and subsisting contract of guaranty nor was there ever any meeting of minds of the parties as to such a contract.
 

 Respondents agree that the guaranty, bonds, and trust indenture should be construed together
 
 (San Francisco T. Seminary
 
 v.
 
 Monterey County G. & E. Co.,
 
 179 Cal. 166 [175 Pac. 693]) but they urge that the evidence clearly establishes that all happenings prior to January 2, 1926, were a part of preliminary negotiations only and that the entire transaction was reflected for the first time in contract form on January 2, 1926, when the contemporaneous delivery to the depositary of guaranty, bonds, and trust indenture merged prior negotiations into a valid and binding contract whereby each and all of the instruments became effective legal documents, conferring rights and obligations in accordance with their tenor. Further, respondents contend that the changes made in the trust indenture were not material.
 

 The trial court found in accord with the reviews of respondents and these findings have support in the evidence. It found that at the time of the issuance of the supplemental permits by the corporation commissioner, none of the bonds had been issued, sold, or delivered, or recorded, and that the guaranty, although signed by the guarantors, had not then been delivered. It found that the deed of trust was delivered and recorded on January 2, 1926, following which, and on the same date, the guaranty was delivered to the depositary in accordance with its express provisions, and bonds in the aggregate principal sum of $250,000 were delivered. It found that “ . . . although in the drafting of said mortgage or deed of trust and the preparation thereof in form for execution and delivery by said The Annandale Corporation some changes were made in drafts thereof, all of said changes were made prior to the signing by said The Annandale Corporation
 
 *126
 
 in due corporate form of said mortgage or deed of trust on or about the 29th day of December, 1925; that none of such changes as were made in the drafting thereof in any way affected the principal of the bonds, the interest thereon, the term, the maturity of the obligation thereof to pay; that none of said changes in said drafts was material; that there never was in fact any mortgage or deed of trust in existence prior to the 2d day of January, 1926, when the mortgage or deed of trust referred to in the Third Amended Complaint was delivered and recorded; and that the same was and is the sole and only deed of trust executed and delivered by said The Annandale Corporation”. The court, at the request of appellants, also made detailed specific findings setting forth the exact changes made in the draft of trust indenture, and it then further found:
 

 “All of the changes above referred to were made in the drafts of said trust indenture, prior to the execution thereof in corporate form on December' 29, 1925, and the delivery and recording thereof on January 2, 1926. The area of the mortgaged premises comprised approximately 158 acres of land, and the value thereof at said time, in its unimproved condition, was in excess of three-quarters of a million dollars. By reason of the facts, firstly, that all of said changes were made in drafts of proposed trust indenture prior to the execution, delivery and recording of any trust indenture and prior to the delivery of said guarantee and the delivery of said bonds concurrently therewith on the 2d day of January, 1926, secondly, that the area omitted by the change in description of premises to be mortgaged bore but a very small proportion to the area of the premises actually mortgaged; thirdly, that the value of the property omitted by said change in description bore but a very small proportion to the value of the premises actually mortgaged; fourthly, that all of said changes had to do with relatively unimportant details in the working up of said trust indenture into final form for execution, and fifthly, that none of .said changes affected the principal of the bonds, the interest thereon, the term, the maturity, or the obligation thereof to pay, the Court finds as a fact that none of said changes was material and that none of said changes in said unexecuted draft of trust indenture operated to release the guarantors of their obligation under the terms and provisions of said guarantee.” The court also found
 
 *127
 
 that “whether the defendants herein were or were not stockholders of The Annandale Corporation when said Guarantee was signed is quite immaterial in view of the statements and representations therein made with reference to being stockholders and the consideration for said guarantee”. The foregoing findings are supported by the record.
 

 The court concluded that: “ (i) No trust indenture other than that delivered and recorded on January 2, 1926, was ever executed, delivered and recorded. All changes, referred to in the foregoing Findings of Fact, were changes in drafts of trust indenture made prior to delivery of said Guarantee, said bonds and said trust indenture. None of the changes made was material, or was of a character to relieve the guarantors of their obligations under said Guarantee. No changes whatever in said trust indenture were made subsequent to January 2, 1926, the date of delivery of said trust indenture, of the first instalment of bonds, and of the Guarantee. The trust indenture referred to in the Guarantee is therefore the only trust indenture ever executed, and it is the one delivered and recorded on January 2, 1926.”
 

 We are in accord with the conclusions expressed by the trial court and any further comment or enlargement of its holding would appear to be superfluous. Neither will we set forth and separately comment upon the various changes made in the proposed form of trust indenture. An examination of the document in its proposed and final forms shows that, as found by the court, all modifications were made prior to the delivery of the guaranty, the bonds, and the trust indenture, and all were relatively unimportant and immaterial, having no effect upon the amount of the principal obligation, interest, or term of indebtedness. There is no merit in appellants’ contention that these changes afford a basis for exonerating the guarantors from liability.
 

 There are no further questions on this appeal which merit discussion. We conclude that the claims of these appellants are untenable.
 

 Separate Appeal of Plaintiffs from Order Made July 12, 1935, Denying Plaintiffs’ Motion for an Order Vacating Judgment and for the Entry of Another and Different Judgment:
 

 This separate appeal by plaintiffs does not involve the right of recovery. It presents the sole question of the extent
 
 *128
 
 of the liability of each guarantor under the terms of the guaranty. Plaintiffs claim the right to a larger recovery than that awarded by the trial court.
 

 The guaranty provided that the “undersigned ... do hereby unconditionally guarantee . . . the punctual payment” of the bonds, “both principal and interest thereon . . . and if default in the payment of either principal or interest thereof be made by said The Annandale Corporation, we and each of us, agree punctually to pay said principal and/or interest in the manner specified in said bonds and in the coupons thereto annexed”. The limitation clause provided: “It is provided, however, as a condition hereof that the obligation and liability of each of the undersigned hereunder shall be limited in amount to the fraction of the total amount of principal and interest of said bonds set after his respective name as follows: W. W. Mines . . . 8/60, Guy M. Rush . . . 11/120, A. C. Robbins . . . 5/60, Dr. Guy Cochran . . . 5/60, M. H. Pehr . . . 5/60, W. P. Story . . . 9/480, Geo.
 
 A.
 
 Orloff . . . 9/480, R. W. Allen . . . 9/480, M. C. Marsh . . . 9/480, Brian K. Welch . . . 4/60, Kenyon F. Lee . . . 4/60, Dr. N. W. Goodman . . . 4/60, Allen T. Archer . . . 4/60, E. R. Kibler . . . 3/60, Horace N. Taylor . . . 2/60 F. W. Braun . . . 6/60, and that each one of the undersigned shall be liable hereunder in an amount equal to, but not in excess of the respective aforesaid fractional amount of the entire principal and interest of said bonds. This guarantee is a continuing guarantee and shall not be exhausted by one or more recoveries thereon but shall bind us in the above proportions until payment has been made in full of the principal and interest of said bonds. ...”
 

 The fractions specified in the guaranty total 480/480ths. At the time here involved bonds to the aggregate principal sum of $104,000, out of the original $350,000, had been retired, leaving $246,000 outstanding, of which plaintiffs held an aggregate of $216,000,
 
 the
 
 subject of this action. On said amount of $216,000, the interest at 6% per cent from date of last payment by the corporation to April 8, 1935 (date of conclusion of trial of this cause), was $50,661. Thus, $216,000 plus $50,661, or $266,661, is the sum to be used in computing the liability of the guarantors.
 

 The trial court concluded as a matter of law that the guaranty “imported and expressed only a several liability upon the part of each guarantor, in the respective proportion of the
 
 *129
 
 unpaid principal and interest upon the bonds owned and held by plaintiffs, namely, $266,661.00, set opposite the respective name of each guarantor”, and that plaintiffs were therefore entitled to a several judgment against each of the defendants, listing them and their several liability commencing as follows: “(a) Against the defendant A. C. Robbins, 5/60ths of $266,661.00, to-wit, $22,221.75”. As the case of defendant Robbins may be used in illustrating the point under discussion, the remainder of the list will not be set forth. The liability of each defendant as fixed in the conclusions of law was carried into the terms of the several judgments entered for plaintiffs.
 

 Plaintiffs’ contention is that the trial court erred in entering a several judgment wherein the maximum limit of liability of each guarantor was reduced to an extent corresponding proportionately to the reduction of the main obligation guaranteed by retirement of some of the bonds and payment of some interest, instead of a judgment holding each defendant liable to the extent of 216/246ths of the maximum specified liability of each, plus interest from the time the liability arose, without any reduction in the limit of liability by reason of reduction of the principal obligation guaranteed. Plaintiffs claim that the liability of each defendant should have been computed in the following manner-—still using the Robbins case as an illustration:
 

 Example: The aggregate principal sum of the bonds at the outset was $350,000, the interest thereon
 
 6y2
 
 per cent, and the term 10 years; that is, the total interest at the specified rate for the specified term was $227,500, and therefore “the total amount of principal and interest” amounted to $577,500, and the limit of liability of A. C. Robbins, fixed in the guaranty, was 5/60ths of the last-mentioned sum, or $48,125. But as only $216,000 aggregate principal amount of $246,000 outstanding is involved in this suit, 216/246ths of $48,125, or $42,256.10 is the maximum amount that plaintiffs would have been entitled to recover from Mr. Robbins, had he paid as soon as his obligation to pay accrued. Between March 1, 1932, and May 12, 1932, an interest instalment of $7,020 was in default, and the interest upon that sum for that period was $91.26. Interest on said sum of $42,256.10 from the latter date, May 12, 1932 (date of acceleration of principal) to April 8, 1935 (date of completion of trial of this cause)
 
 *130
 
 at
 
 &y2
 
 per cent per annum, amounts to $7,988.17. Hence the total interest which accrued to date of trial by reason of Mr. Robbins ’ failure to pay to plaintiffs as and when his obligation to pay arose, $8,079.43 ($91.26 plus $7,988.17), added to $42,256.10 (said 216/246ths of his total liability to the holders of outstanding bonds), amounts to $50,335.53, the maximum liability as of April 8, 1935, date of completion of trial. Plaintiffs contend that they were entitled to a judgment against defendant guarantors to the extent of $266,661, limited only by a maximum recovery against each computed by the method used above to fix the maximum limit of recovery against defendant Robbins at $50,335.53.
 

 Plaintiffs contend that if it had been the intent to limit the proportionate guaranty to fractions of the outstanding unpaid indebtedness, rather than to fractions of the entire indebtedness, the guaranty would have so specified by insertion of the word “unpaid” in such phrases as “the obligation and liability of each of the undersigned hereunder shall be limited in amount to the fraction of the total amount of (unpaid) principal and interest”, and “each one of the undersigned shall be liable hereunder in an amount equal to, but not in excess of the respective aforesaid fractional amount of the entire (unpaid) principal and interest of said bonds”. Defendants, on the other hand, claim that it is clear from the provision of the guaranty that
 
 “if default
 
 ... be made . . . we and each of us, agree punctually to pay said principal and/or interest ... ”, that the guarantors intended to and did, by the clear purport of the language used, guarantee in the maximum only the sioecified fraction of outstanding unpaid indebtedness.
 

 We are in accord with the construction placed upon the guaranty by the trial court. By the plain import of its terms it gives to each bondholder a right of action against each guarantor for a fractional proportion of the indebtedness represented by each bond, so that the payment of a bond proportionately reducing the main indebtedness, satisfies each guarantor’s proportionate liability for payment of the bond retired. In this way, plaintiffs, holding $216,000 of the bonds, would be entitled to recover, for example, from defendant Robbins, 5/60ths of that sum with interest, and in like manner from each other guarantor. It is not necessary to discuss with greater particularity plaintiffs' analysis of the
 
 *131
 
 language of the guaranty, as it appears on the face of the instrument that the above construction is the proper one.
 

 It is true that with liability computed in the manner here approved, there will not be, in the event of insolvency of some of the guarantors, a complete recovery for the bondholders, whereas, with liability computed by plaintiffs’ method, the possible recovery would total more than the unpaid indebtedness. Plaintiffs say that the latter fact is immaterial for the reason that overlapping protection is proper and customary in providing against possible financial irresponsibility of some guarantors and for the further reason that plaintiffs could not in any event recover more than the existing debt on the bonds which they hold, nor more than the proportion of each guarantor’s specified maximum liability. Plaintiffs’ theory is that the guaranty consists of two separate and distinct parts, the first and fundamental part being a joint and several guaranty of the entire obligation, both principal and interest, and the second part being the limitation in amount of liability of each of the guarantors; that, therefore, upon retirement of any bond, there would conic into operation the “joint” feature which would permit collection from each guarantor of an amount equal to his fraction of liability upon the retired bond, which amount could be applied to make up any deficit caused by other guarantors’ inability to pay.
 

 The guaranty, in our view, imposes only a several liability, regardless of which method is used to compute it, and in reality the judgment for which plaintiffs are asking is simply a several judgment against each defendant guarantor for his fraction of the entire indebtedness without deduction for retired bonds. But we find no warrant under the terms of the guaranty for holding any guarantor liable for more than his proportion of the unpaid indebtedness. Plaintiffs’ argument seems strained and it does not support any reasonable interpretation of the guaranty. The actual wording of the instrument, and its only clear and reasonable purport, imposes a several liability against the guarantors limited to fractional proportions of the outstanding unpaid indebtedness. The trial court used the proper method in computing the respective amounts awarded by the judgment, and properly denied plaintiffs’ motion for an order vacating judgment and for the entry of another and different judgment.
 

 
 *132
 

 Appeal of Defendant and Cross-Complainant Goodman:
 

 This appellant filed a separate answer to plaintiffs’ complaint and in addition filed, on February 13, 1934, a cross-complaint and counterclaim for an accounting, equitable set-off, and declaratory relief, wherein he joined as cross-defendants : (1) the plaintiffs; (2) his co-defendants; and (3) other of the guarantors who were not named as defendants in the main action, and of whom defendant Archer was served and answered.
 

 The cross-complaint alleged in detail facts and circumstances surrounding the making of the guaranty, and issuance and sale of the bonds, and the disputed issues litigated under the pleadings in the main action. It further alleged that cross-complainant was the owner and holder of a $1,000 outstanding bond, being one of the $30,000 block of outstanding bonds which were not deposited with
 
 the
 
 bondholders’ committee ; that cross-complainant was also the owner and holder of a certificate of deposit for 20 bonds, of $20,000 par value, deposited with the committee; hence that cross-complainant occupied a triple status, to wit (1) as a signer of the guaranty ; (2) as owner and holder of a $1,000 outstanding undeposited bond; and (3) as owner and holder of the certificate of deposit and of the $20,000 of deposited bonds represented by said certificate. The dates upon which cross-complainant acquired the $1,000 bond and $20,000 certificate were not alleged, but upon the trial the evidence showed, and the court found, that the $20,000 certificate was acquired on January 30, 1934 (about two weeks prior to the filing of the cross-complaint and more than a year after the commencement of this action), and that cross-complainant owned the $1,000 bond on the date he filed his cross-complaint.
 

 The pleading set forth cross-complainant’s claim to a right of recovery from his coguarantors upon the $1,000 bond; likewise his rights by reason of his beneficial ownership of the $20,000 bonds, and his claim to a set-off of his liability, if any, as a guarantor against any amount recovered by plaintiffs upon said bonds; that is, his claim to 20/216ths of any judgment secured by plaintiffs against defendant guarantors, with the further right to a set-off
 
 pro tanto
 
 of any liability or obligation which might be due from him as a guarantor. The prayer of cross-complainant was for a declaration of the rights and liabilities of the parties, for an accounting from
 
 *133
 
 plaintiffs, for allowance of set-off, for costs, and for general relief.
 

 The original defendants herein, and cross-defendant Archer, joined in filing an answer to the cross-complaint which admitted every allegation thereof save a conceded error as to a date. Plaintiffs filed a separate answer containing admissions and denials.
 

 The trial court made full findings as to the truth or untruth of the allegations of the respective cross-pleadings, which findings were consistent with its findings on the issues presented by the main case. It also found that as between cross-complainant and the answering cross-defendants other than plaintiffs, the allegations of the cross-complaint were deemed true because of failure to deny same. As a matter of law the court concluded that the allegations of the cross-complaint and answer of plaintiffs thereto raised no issues whatever between the plaintiffs, on the one hand, and cross-complainant, on the other hand, not fully raised by the pleadings in the main action; that the rights of cross-complainant as owner of the $1,000 bond and $20,000 certificate were not mutual and in the same right as those of the plaintiffs as trustees of an express trust, and therefore credit or offset was unavailable; that cross-complainant was liable for 4/16ths of $266,661 or $17,777.40; that he was not entitled to any relief under the allegations of his cross-complaint and supplemental pleadings, either as against plaintiffs or the other cross-defendants. The judgment conformed to these conclusions. Cross-complainant’s appeal therefrom is separately briefed under two main headings: (1) that the judgment against defendants was erroneous; and (2) that the judgment that cross-complainant take nothing on his cross-complaint was erroneous.
 

 Under part I of his brief this appellant argues every contention set forth in the briefs filed on the main appeal. These questions need no further discussion as they have already had ample consideration. In addition, this appellant contends that the effect of admissions in the pleadings is to compel a reversal of the judgment against the guarantors. In this connection appellant reviews in great detail the lengthy and elaborate pleadings and findings and asserts: That the allegations of the cross-complaint showed that there was no liability on the part of the guarantors for various reasons, such as that the trust indenture was changed or ma
 
 *134
 
 terially altered subsequent 1o “execution” of the guaranty, execution, as defined by section 1933 of the Code of Civil Procedure, including both the subscribing and the delivering of the
 
 instrument;
 
 that plaintiffs, in their answer to the cross-complaint, by failure to deny, admitted these vital allegations establishing the nonliability of the guarantors; that certain findings of the trial court were contrary to the matters so admitted by failure to deny, and hence such findings must be disregarded in determining the proper conclusion of law to be drawn from the facts found. (24 Cal. Jur., p. 982, par. 211.)
 

 This appellant's analysis of these lengthy pleadings is highly technical, and we are not prepared to say that he is correct in his contention that certain material allegations were admitted by failure to deny same. It is certain that plaintiffs, in their answer to the cross-complaint, had no intention of making admissions which might defeat recovery by them, and which would be directly contrary to the allegations of their pleadings upon which issues were joined in the main action, and directly contrary to some of the contentions most strongly urged by them. It would seem that if the pleadings in the cross-action are read as a whole, and the language of plaintiffs’ answer is given its usual and ordinary meaning, and said allegations are viewed in the light of plaintiffs’ pleadings in the main action, it should not be said that the answer to the cross-complaint failed to sufficiently define and join the issues in a manner consistent with the issues as joined in the main action. Undoubtedly the trial court read the pleadings as properly joining the issues, for although throughout the trial this appellant urged that under the admissions of the answers to his cross-complaint no recovery could be had against him, and moved for exclusion of testimony, for dismissal of the complaint as to him, for judgment on the pleadings, et cetera, these motions were repeatedly denied. Thus, in this particular ease and under the peculiar circumstances here shown, the findings of the trial court in the cross-action, consistent with its findings upon identical issues joined in the main action, are conclusive and appellant’s claims as to alleged admissions by failure to deny cannot be sustained.
 

 This brings us to a consideration of the questions urged in part II of this appellant’s brief, based upon his claim that the judgment denying him relief upon his cross-complaint was erroneous. In disposing of these contentions we are mindful of the broad and liberal interpretation which has, since the
 
 *135
 
 amendments of 1927, been adopted with reference to sections 438 and 442 of the Code of Civil Procedure, and other sections regarding cross-complaints and counterclaims.
 
 (Terry Trading Corp.
 
 v.
 
 Barsky,
 
 210 Cal. 428 [292 Pac. 474];
 
 Hanes
 
 v.
 
 Coffee,
 
 212 Cal. 777 [300 Pac. 963];
 
 California Trust Co.
 
 v.
 
 Cohn,
 
 214 Cal. 619 [7 Pac. (2d) 297];
 
 Martin
 
 v.
 
 Hall,
 
 219 Cal. 334 [26 Pac. (2d) 288].) In the case last cited the cross-complaint was based upon facts arising subsequent to issue joined on the original pleadings, which is the situation presented in this case.
 

 The first question is: Should not this appellant, as owner and holder of the $1,000 unpaid, undeposited bond, have been accorded relief against his coguarantor cross-defendants ? This question must be answered in the affirmative. As appears from the discussion of the main appeal, the owner and holder of any one of the unpaid bonds of $30,000 par value which were not deposited with plaintiffs, has a right to sue upon the guaranty. This right has been expressly protected by the trial court’s method of fixing the liability of the guarantors and by its conclusion of law that: “The court is of course obligated to preserve and protect the rights of other bondholders not parties to this action. The plaintiffs were not required to join in this action, either as plaintiffs or defendants, the holders of other bonds outstanding, for the reason that the guarantee expressly provides that the holder of any bond may from time to time bring suit upon said guarantee either by himself as plaintiff or as plaintiff in conjunction with the holders of other bonds. There was no defect in parties defendant in that other guarantors were not joined in this action, for the reason that said guarantee expressly provides that the holder or holders of any bonds may in any suit join all or any part of the guarantors as defendants. ’ ’
 

 This appellant, as owner of the $1,000 bond, unquestionably could have brought a separate action against all or part of his coguarantors to recover upon the guaranty. There is no reason why he should not be permitted to seek such relief in this action. The right in this respect, which he asserted as a cross-complainant, was identical with the right asserted by plaintiffs, as holders of unpaid bonds, to recover upon the guaranty.
 

 A question arises as to the status of cross-defendant Archer. This guarantor was not a defendant in the maní
 
 *136
 
 action but was brought into the case as a new party by the filing of the cross-complaint. He was not a necessary or indispensable party to the action. Cross-complainant might have sued him separately upon his several liability under the guaranty. However, he raised no question of misjoinder in the trial court. He was served and joined in the answer of his coguarantor cross-defendants to the cross-complaint, which answer admitted all material allegations of that pleading. He made no appearance on the trial and on this appeal he filed no brief supporting his position as a respondent.
 

 As between plaintiffs and cross-defendant Archer there was, of course, no issue and plaintiffs have made no objection to his presence as a cross-defendant. As between cross-complainant and said cross-defendant, however, the relief sought was identical with the relief sought against the other guarantor cross-defendants, and with the relief sought by plaintiffs against defendants in the main action. It involved no collateral issue but was relevant to, indeed a part of, the very transaction upon which the main action was based. To permit the issue between cross-complainant and said cross-defendant to be here litigated is merely to avoid the prosecution of a separate suit.
 

 Under these circumstances, it will not be held on appeal that the trial court erred in refusing to exclude said new party cross-defendant. Objection to the joinder on the ground that he was not a necessary party should have been urged in the trial court. On appeal it is too late to raise the point.
 
 (Syvertson
 
 v.
 
 Butler,
 
 3 Cal. App. 345 [85 Pac. 164];
 
 Kunz
 
 v.
 
 California Trona, Co.,
 
 169 Cal. 353 [146 Pac. 885];
 
 Bank of America Nat. T. & S. Assn.
 
 v.
 
 Fidelity & D. Co.,
 
 9 Cal. App. (2d) 687 [51 Pac. (2d) 472]; 20 Cal. Jur., p. 538, sec. 34.)
 

 Cross-complainant, as owner of the $1,000 bond, is entitled to judgment against the cross-defendant guarantors, including cross-defendant Archer.
 

 Lastly, there is the question of the propriety of the trial court’s action in denying this appellant any relief by way of cross-complaint, set-off, or counterclaim, growing out of his ownership of the certificate of deposit representing $20,000 of the $216,000 par value bonds deposited with plaintiffs. Upon this issue the trial court’s conclusion was that the rights of appellant as owner of the certificate were “not mutual and in the same right as those of the plaintiffs herein
 
 *137
 
 as trustees of an express trust, and therefore credit or offset is unavailable ’ ’.
 

 We are of the view that the action of the trial court in this regard was proper. The bondholders’ protective agreement clothed the committee with broad' powers in the handling of the deposited bonds, the conduct of litigation, and the consummation of the purposes of the trust. Among other things it provided concerning deposited bonds: “After any such deposit no separate action shall be taken by a depositor with respect to the deposited securities.” This section effectually bars appellant in this action from asserting any separate right as to his deposited securities not asserted by other depositors. Appellant might have taken steps to withdraw his deposited securities and thus have become free to assert all rights incident to ownership thereof. The bondholders’ agreement contains a provision permitting withdrawal of securities, with the consent of the committee, upon the giving of notice, and payment of the depositor’s
 
 pro rata
 
 of all expenses. Appellant was not denied the right of withdrawal. He simply, so far as this record shows, made no effort to invoke the provision. Under such circumstances he is bound by the contract of deposit prohibiting independent action on the deposited securities.
 

 Conclusion:
 

 (1) The order of July 12, 1935, denying plaintiffs’ motion for an order vacating judgment and for the entry of another and different judgment, is affirmed;
 

 (2) That portion of the judgment which denies cross-complainant Goodman any recovery upon his cross-complaint is reversed, with directions to the court below to modify its findings of fact and conclusions of law to accord with the views above expressed and to enter a several judgment in favor of cross-complainant Goodman, as owner of the $1,000 bond, against all cross-defendant guarantors properly served ; said judgment to be computed by the method used by the trial court in computing the award in the main action; on this appeal by cross-complainant Goodman, both parties to bear their own costs on appeal.
 

 (3) In all other respects the judgment, including that against said Goodman as a defendant in the main action, is affirmed.
 

 Rehearing denied.